# In the United States Court of Federal Claims

No. 16-995L
Filed: June 28, 2021
FOR PUBLICATION

<table>
<tr><td>

**DUANE OMAR BURNETT, et al.,**

        *Plaintiffs,*

**v.**

**UNITED STATES,**

        *Defendant.*

</td><td>

Rails-to-Trails; Fifth
Amendment Takings; Notice
of Interim Trail Use;
Abandonment; Partial
Summary Judgment; RCFC 56

</td></tr>
</table>

*John Robert Sears*, Baker, Sterchi, et al., St. Louis, Missouri for plaintiffs.

*Joseph Hosu Kim*, Trial Attorney, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant.

## OPINION

**FUTEY**, *Senior Judge*

## I.     INTRODUCTION

This Rails to Trails case is before the Court on plaintiffs' second motion for partial summary judgment on state law abandonment. The government has filed a cross-motion for partial summary judgment alleging that federal law preempts state law regarding abandonment of a railroad corridor. Plaintiffs are landowners of property located adjacent to a railroad line, the Rock Island Line, owned by Missouri Central Railroad Company ("MCRR"). They seek to establish that, under Missouri law, MCRR abandoned its easements located on plaintiffs' land prior to the issuance of a Notice for Interim Trail Use ("NITU"), effecting an alleged Fifth Amendment taking of their reversionary interest in the property. Plaintiffs have brought this action against the federal government pursuant to the National Trails System Act, 16 U.S.C. §§ 1241–51.

In a previous ruling, the Court determined that the railroad owned some of plaintiffs' parcels in fee simple and granted summary judgment to the government on these claims.[1] Nine

---

[1] The Court determined that MCRR owns in fee simple the property at issue with respect to plaintiffs' claims 1 (Atkins); 10 (Kinkead); 13a and b (Morton); 19 (Martin Five Ltd. Partnership); 22a and b (Value Investments LLC, Estate of John H. and Temple Lee Vance); and

claims remain. As to these claims, the Court previously held that the railroad acquired only easements located on plaintiffs' land, and that the easements were sufficiently broad to encompass public recreational trail use and railbanking. Plaintiffs seek to establish liability with respect to these claims by showing that they were abandoned under state law prior to the issuance of a Notice for Interim Trail Use.

Thus, as to the parcels conveyed by easement, the nine plaintiffs now moving for partial summary judgment on the issue of abandonment are represented by claim numbers 2 (Belle Community Fair); 3 (Burnett); 5 (Durbin); 6 (Griggs); 7 (Holaway); 11 (Lemons); 17a (Seymour); 20 (Turner); and 21 (Zumwalt). Plaintiffs move on the basis that the railroad abandoned the easements under Missouri law and a taking occurred when the Surface Transportation Board ("STB") subsequently issued a Notice of Interim Trail Use ("NITU").

To address rails-to-trails takings claims, the United States Court of Federal Claims applies a three-step analysis set forth by the United States Court of Appeals for the Federal Circuit in *Presault v. United States*, 100 F.3d 1525 (Fed. Cir. 1996) ("*Presault II*"). *Presault II* established that liability for a taking by the United States in this context is based upon answers to three questions:

1. Who owns the strip of land involved, specifically, whether the railroad acquired only an easement or obtained a fee simple estate;
2. If the railroad acquired only an easement, were the terms of the easement limited to use for railroad purposes, or did they include future use as a public recreational trail (scope of easement); and
3. Even if the grant of the railroad's easement was broad enough to encompass a recreational trail, had this easement terminated prior to the alleged taking so that the property owner at the time held a fee simple interest unencumbered by the easement (abandonment of the easement)?

As stated, the Court previously issued a decision concluding that MCRR owned some of plaintiffs' parcels in fee simple, but only acquired use of others by easement. The Court determined further that these easements were broad enough to encompass public recreational trail use and railbanking. Now, plaintiffs seek to establish a taking with a determination under the third prong of *Presault II* that the easements were terminated, or abandoned, under state law prior to the STB's issuance of an NITU.

---

23 (JHV Holdings, LLC). On this basis, the Court denied plaintiffs' first motion for partial summary judgment and granted the government's cross-motion for summary judgment with respect to these claims. The Court also determined that plaintiffs Wayne and Gloria Misner (claim 12) did not own property located adjacent to the rail corridor at issue on the date of the issuance of the NITU. On this basis, the Court also denied this taking claim. The Court dismissed claim number 14 and 16 on October 4, 2017. The Court's previous ruling noted that the parties agreed that MCRR holds easements limited to railroad purposes for claim numbers 4 a and b, 8, 9, 15, and 18. The parties further agreed that plaintiffs had "no claim" for claim numbers 17b, c, and d.

In their motion, plaintiffs argue that abandonment occurred under Missouri law because the railroad demonstrated its intent to abandon the line by filing a Verified Notice of Exemption to the STB. Plaintiffs assert that the STB's subsequent issuance of an NITU was a taking because it re-established a public easement. Plaintiffs offer other evidence of abandonment under state law, including press clippings, statements made by the railroad, official public records, eyewitness testimony and affidavits, and lack of railroad use.

In its cross-motion, the government maintains that federal law must be applied to ascertain whether abandonment occurred prior to the Court's consideration of state-law abandonment factors. Specifically, the government argues that the only legally cognizable way to abandon a railroad line is to file a Notice of Consummation to the STB pursuant to 49 C.F.R. § 1152.29(e)(2), which MCRR declined to do. Additionally, the government asserts that the abandonment authority conferred by the STB to a railroad is permissive, such that a railroad is not compelled to carry out the abandonment after it has filed a Verified Notice of Exemption. Further, the government argues that even if there was pre-NITU abandonment, there can be no taking because the NITU would be invalid and property owners would be barred from challenging the ultra vires act in this Court.

The matter is now ripe for disposition.

## I.  BACKGROUND

### a. Relevant Factual Background

This "rails-to-trails" case involves an alleged taking of real property situated along a 144.3 mile railroad corridor known as the Rock Island Line located in Cass, Pettis, Benton, Morgan, Miller, Cole, Osage, Maries, Gasconade, and Franklin Counties in the State of Missouri.

Additional factual background of plaintiffs' claims is provided in an opinion previously issued by the Court in this matter. *Burnett et al. v. United States*, 139 Fed. Cl. 797, 801–03 (2018). In that ruling, the Court resolved most of plaintiffs' claims by granting partial summary judgment for the government. The Court determined that nine claims remained, and these were parcels to which MCRR held easements broad enough to encompass public recreational trail use and railbanking. *See generally Burnett et al.*, 139 Fed. Cl. 797 (2018). The Court now addresses these nine easement-based takings claims herein.

On November 18, 2014, MCRR filed a Verified Notice of Exemption to the Surface Transportation Board ("STB") pursuant to 49 U.S.C. § 10502 and 49 CFR § 1152.50 to abandon and discontinue its interest in the Rock Island Line. ECF No. 38-2 at 2–3. The Notice reads:

> The MCRR and Central Midland Railway Company submit this joint verified Notice of Exemption pursuant to 49 U.S.C. § 10502 and 49 C.F.R. § 1152.50 for the abandonment and discontinuance of approximately 144.3 miles of rail line in two segments.

The Notice asserts that, "MCRR proposes to abandon the Line," and sets forth a consummation date for abandonment on or after January 7, 2015. The Certification portion, required by 49 C.F.R. § 1152.50(b), notes that the MCRR President "confirm[s] no traffic has originated, terminated, or moved ahead on the Line for at least two years."

On December 16, 2014, the Missouri Department of Natural Resources filed a request for the issuance of a Notice for Interim Trail Use ("NITU") to allow the department to negotiate with MCRR for the acquisition of the rail corridor for use as a trail under the National Trails Systems Act. The STB issued the NITU on February 25, 2015. Although the original NITU would have expired 180 days thereafter, the MCRR requested and received multiple extensions of the NITU. The last known expiration date of the NITU was February 21, 2019. According to the briefs, no railbanking and interim-trail-use agreement was established with respect to the Rock Island Line.

MCRR declined to file a notice of consummation pursuant to 49 C.F.R. § 1152.29(e)(2).

Various plaintiffs submitted eyewitness affidavits attesting to the railroad's abandonment of the line. Mr. Burnett attested that, "there has been no railroad activity on the railroad line" since at least September 12, 2007. Mr. Dillon attested that there was no railroad activity on the railroad line since at least October 13, 2006. He specified that, "[t]rains haven't run on the Rock Island Railroad Line since about 1972." Ms. Jones attested that there was no railroad activity on the railroad line since September 16, 1992 and that since that time her "step-father kept the brush cut down on the railroad line right of way until 2009." Mr. Kidwell attested that there was no railroad activity on the line in nearly thirty years and that the "brush and sticker bushes were so thick in the right of way, it was impassable." Ms. Rackers attested that there was no railroad activity on the railroad line since March 20, 1986. She specified that, "[t]he section of the railroad line that intersects with the main crossroad in town, T Road, was paved over with blacktop at the intersection more than ten years ago."

The government asserts that MCRR and previous owners transferred the rail line for continued use as a rail line, allowed fiber optic cables to be laid along the line, and leased portions of the line to an adjacent landowner. The Rock Island Line corridor was sold in 1996 to Union Pacific Railroad Company, which sold it to MCRR in 1999. MCRR then sold operating rights to Central Midland Railway Company in 2004. From 1983 to 2014, Union Pacific and then MCRR leased a portion of the corridor to Mr. Charles James.

**b. Procedural Background**

This Court previously denied plaintiffs' first motion for partial summary judgment on liability and granted the government's cross-motion for summary judgment on standing and title issues on October 9, 2018. Subsequently, the Court stayed the matter pending the United States Court of Appeals for the Federal Circuit's decisions in *Caquelin v. United States*, 697 F. App'x 1016 (Fed. Cir. 2017) or in *Memmer v. United States*, Nos. 2017-2150, 2017-2230, 2017 WL 6345843 (Fed. Cir. Nov. 16, 2017), or until the railroad reached a trail-use agreement.

Specifically, the Court's October 2018 ruling addressed the first two questions for liability, concluding that MCRR owned the land in fee simple and that the scope of the easements under consideration were broad enough to include recreational trail use. The Court, however, has not

considered the third question of whether abandonment occurred under Missouri property law prior to the STB's issuance of the NITU until now. Plaintiff's position is that the government could still be liable for takings if prior abandonment occurred under state law.

On November 2, 2020, the parties filed a Joint Status Report proposing to file summary judgment motions on the third question, prior abandonment, and requesting that all other briefing be stayed. On December 14, 2020, plaintiffs filed a motion for partial summary judgment on the issue of prior abandonment under Missouri property law. On February 8, 2021, the government filed a response to plaintiffs' motion and a cross-motion for partial summary judgment. On March 30, 2021, plaintiffs filed a response to the government's cross-motion and a reply in support of its motion for partial summary judgment. On April 23, 2021, the government filed a reply in support of its motion for partial summary judgment.

With these matters fully briefed, the Court now resolves the pending issue.

## II.  DISCUSSION

### a.  Legal Standards

#### i.  Jurisdiction

The Tucker Act grants this Court jurisdiction over Fifth Amendment takings claims brought against the United States. *See* 28 U.S.C. § 1491; Morris v. United States, 392 F.3d 1372, 1375 (Fed. Cir. 2004) ("[T]he Tucker Act provides the Court of Federal Claims exclusive jurisdiction over takings claims for amounts greater than $10,000.").

#### ii.  Summary Judgment

A grant of summary judgment is appropriate when the pleadings, affidavits, and evidentiary materials filed in a case reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Biery v. United States*, 753 F.3d 1279, 1286 (Fed. Cir. 2014). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. A fact is "material" if it could "affect the outcome of the suit under the governing law ...." *Id.*

In resolving motions for summary judgment, the Court will not make credibility determinations and will draw all inferences "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). In doing so, the Court does not weigh the evidence presented, but instead must "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *Agosto v. INS*, 436 U.S. 748, 756 (1978) ("[A trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented ...."); *see also Am. Ins. Co. v. United States*, 62 Fed. Cl. 151, 154 (2004). And

so, the Court may only grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party ...." *Matsushita*, 475 U.S. at 587.

The above standard applies when the Court considers cross- motions for summary judgment. *See Principal Life Ins. Co. & Subsidiaries v. United States,* 116 Fed. Cl. 82, 89 (2014); *see also Estate of Hevia v. Portrio Corp.*, 602 F.3d 34, 40 (1st Cir. 2010). And so, when both parties move for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Abbey v. United States*, 99 Fed. Cl. 430, 436 (2011) (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

### iii. Fifth Amendment Takings and "Rails-to-Trails" Cases

A Fifth Amendment takings occurs in rails-to-trails cases when the government, through the issuance of a CITU or NITU, destroys an individual's state law reversionary interest in property underlying a railroad right-of-way. *Ladd v. United States*, 630 F.3d 1015, 1023–24 (Fed. Cir. 2010); *Barclay v. United States*, 443 F.3d 1368, 1373 ("The issuance of the NITU is the only event that must occur to 'entitle the plaintiff to institute an action.' Accrual is not delayed until a trail use agreement is executed or the trail operator takes physical possession of the right-of-way.") (internal citations omitted). "Only persons with a valid property interest at the time of the taking are entitled to compensation." *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001).

As previously mentioned, to determine whether a Fifth Amendment takings has occurred in a rails-to-trails case, the Court follows a three-step analysis established by the United States Court of Appeals for the Federal Circuit. *See Ellamae Phillips Co. v. United States*, 564 F.3d 1367, 1373 (Fed. Cir. 2009) (citing *Presault v. United States*, 100 F.3d 1525, 1533 (Fed. Cir. 1996) ("*Presault II*"). First, the Court must determine who owned the land at issue at the time of the takings. *Id.* Second, if the railroad company owned only an easement, the Court must determine whether the terms of the easement include use as a public recreational trail. *Id.* Third, if the railroad company's easement is broad enough to encompass recreational trail use, as the Court has decided in this matter, the Court must then determine whether the easement terminated prior to the alleged takings, so that that property owner held a fee simple estate unencumbered by easement at the time of the takings. *Id.*

### iv. Abandonment

### 1. Federal Law and Regulations

For more than a century, the federal government has exercised plenary authority over the abandonment of most railroad corridors in the United States. *See* Transportation Act of 1920, ch. 91, 41 Stat. 456 (1920) (the "Transportation Act"). The Interstate Commerce Act of 1887, Pub. L. No. 95-473, 92 Stat. 1337 (recodified at 49 U.S.C. §§ 1101, 1121) and the Transportation Act (recodified at 49 U.S.C. § 10903) grant regulatory jurisdiction to the Interstate Commerce Commission ("ICC"), which is possessed now by its successor, the Surface Transportation Board ("STB" or "Board").[2] *See Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311,

---

[2] *See generally Burnett et al. v. United States*, 139 Fed. Cl. 797, 801–06 (2018).

321 (1981). A railroad seeking to abandon a railroad right-of-way within the jurisdiction of the STB must either (1) file a standard abandonment application that meets the requirements of 49 U.S.C. § 10903, or (2) seek an exemption under 49 U.S.C. § 10502.

As relevant here, a rail carrier qualifies for an exemption if it certifies that no local traffic has moved over the line for at least two years and that any overhead traffic can be rerouted over other lines. 49 C.F.R. § 1152.50(b). The National Trails System Act Amendments of 1983, Pub. L. No. 98-11, § 208, 97 Stat. 42, 48 ("Trails Act"), provides for blocking of "abandonment," however, despite the absence of any rail use, present or in prospect, if a proper entity agrees with the railroad to take over the rail right-of-way for trail use. 16 U.S.C. § 1247(d). Such trail use is deemed "interim," *id.*, and the term "rail banking" is applied, 49 C.F.R. § 1152.29(a), because rail use may someday be restored.

When a rail carrier applies for permission to abandon, as MCRR did, the Board's regulations provide that any prospective trail sponsor may file a comment indicating an interest "in acquiring or using a right-of-way of a rail line ... for interim trail use and rail banking." 49 C.F.R. § 1152.29(a). If the rail carrier agrees to negotiate an agreement with such a potential trail sponsor, the Board will issue to the rail carrier and potential trail sponsor a NITU providing for a 180-day negotiation period. *Id.* § 1152.29(d)(1); see also *Preseault v. Interstate Commerce Commission*, 494 U.S. 1, 7 n.5 (1990) (*Preseault I*). Consistent with the limitation of potential outcomes recognized in the full name—"a Notice of Interim Trail Use or Abandonment"—the NITU generally provides that the rail carrier may, during the NITU period, continue the process of physical abandonment, *i.e.*, may "discontinue service, cancel any applicable tariffs, and salvage track and materials." 49 C.F.R. § 1152.29(d)(1); *see also Preseault I*, 494 U.S. at 7 n.5. If the parties reach an agreement, and duly notify the Board, the right-of-way remains under Board jurisdiction indefinitely while used as a recreational trail, and state law may not treat that "interim use ... as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C. § 1247(d). If the parties fail to reach an agreement, and the NITU expires, the rail carrier gains authority to abandon; that authority does not mandate abandonment, but if the rail carrier does not exercise the authority within a one-year period defined by regulation, it cannot abandon without filing a new request for abandonment authority. 49 C.F.R. § 1152.29(d)(1), (e)(2).

Section 8(d) specifically provides that "such interim use [for trails] shall not be treated, for purposes of any [state] law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C.A. § 1247(d). Thus, section 8(d) of the Trails Act prevents the operation of state laws that would otherwise come into effect upon abandonment – property laws that would "result in extinguishment of easements for railroad purposes and reversion of rights of way to abutting landowners." *Rail Abandonments—Use of Rights–of–Way as Trails*, Ex Parte No. 274 (Sub–No. 13), 2 I.C.C.2d 591, 1986 WL 68617 (1986); *see also Caldwell v. United States*, 391 F.3d 1226, 1229 (Fed. Cir. 2004).

A railroad that receives authority from the Board to abandon a line (in a regulated abandonment proceeding under 49 U.S.C. 10903, or by individual or class exemption issued under 49 U.S.C. 10502) shall file a notice of consummation with the Board to signify that it has exercised the authority granted and fully abandoned the line (e.g., discontinued operations, salvaged the track, canceled tariffs, and intends that the property be removed from the interstate rail network).

49 C.F.R. § 1152.29(e)(2). "[I]t is only upon actual consummation of the abandonment that the STB's jurisdiction ceases." *Baros v. Texas Mexican R.R. Co.*, 400 F3d 228, 236 (5th Cir. 2005). "[T]he filing of a notice of consummation now provides the only legally recognizable way to consummate abandonment of a rail line that is subject to the Board's licensing requirements." *Honey Creek R.R., Inc.—Petition for Decl. Order*, 2008 WL 2271465 (S.T.B.) at 5 (STB served June 4, 2008).

The consummation notice shall be filed within one year of the service date of the decision permitting the abandonment. *Id.* Notices will be deemed conclusive on the point of consummation if there are no legal or regulatory barriers to consummation (such as outstanding conditions, including Trails Act conditions). *Id.* If, after one year from the date of service of a decision permitting abandonment, consummation has not been effected by the railroad's filing of a notice of consummation, and there are no legal or regulatory barriers to consummation, the authority to abandon will automatically expire. *Id.* In that event, a new proceeding would have to be instituted if the railroad wanted to abandon the line. *Id.*

## 2. Missouri Abandonment Law

Railroads are subject to regulation by the federal government, while the property rights of railroads and landowners lie solely within the bounds of state law. *Glosemeyer v. United States*, 45 Fed. Cl. 771, 773 (2000). Because the Rock Island line is located in the State of Missouri, Missouri law applies in this case. *Presault I*, 494 U.S. at 20–21 (O'Connor, J., concurring).

A railroad easement is extinguished in Missouri when "the railroad ceases to run trains over the land." *Schuermann Enterprises, Inc. v. St. Louis County*, 436 S.W.2d 666, 668 (Mo. 1969 citing *State Highway Comm'n v. Griffith*, 114 S.W.2d 976, 980 (Mo. 1938)). Property owners hold their property free from the burden of any easement once the railroad ceases to use the property for railroad purposes. *Boyles v. Mo. Friends of the Wabash Trace Nature Trail, Inc.*, 981 S.W.2d 644, 649–50 (Mo. App. W.D. 1998). Abandonment is shown with proof that the railroad intended to abandon without the intention to possess it again. *Moore v. Mo. Friends of the Wabash Trace Nature Trail, Inc.*, 991 S.W.2d 681, 688 (Mo. App. W.D. 1999) (citing *Boyles*, 981 S.W.2d at 648). "An intention to abandon is inferred by the discontinuance of rail service with no prospect for resumption of service." *Kansas City Area Transp. Auth. v. 4550 Main Assoc., Inc.*, 742 S.W.2d 182, 191 (Mo. App. W.D. 1986).

Once abandonment has been established, there is a Fifth Amendment taking when the government asserts its control over a previously abandoned railroad corridor, such as by issuing an NITU. *Presault II*, 100 F.3d at 1533; *Ellamae Phillips Co.*, 564 F.3d at 1373.

### b.  Analysis

The Court previously determined that the easements at issue in this case are not limited to railroad use. Rather, they are sufficiently broad to encompass recreational trail use or railbanking, as occurred here. Therefore, to establish a compensable taking, plaintiffs must demonstrate that MCRR fully abandoned the easements before the STB issued the NITU.[3] Without abandonment, the easements would remain.

Here, plaintiffs seek to establish that a compensable taking occurred when the STB issued an NITU to MCRR. They rely on *Presault II* and *Ellamae Phillips Co.* because, in those cases, the Federal Circuit ruled that when the federal government asserts its control over a previously abandoned railroad corridor, such as by issuing an NITU, a Fifth Amendment taking occurs. Plaintiffs must first, however, demonstrate that MCRR abandoned the Rock Island Line before the STB issued the NITU.[4] Plaintiffs contend that abandonment did precede the issuance of the NITU because, under Missouri law, abandonment is shown with proof of a railroad's intent to abandon. Plaintiffs assert that MCRR's filing of the Verified Notice of Exemption in which it proposes to abandon the Rock Island Line, plus eyewitness testimony as to the apparent lack of railroad use, satisfies the Missouri abandonment test.

Nonetheless, plaintiffs' contention that abandonment occurred under Missouri state law puts the cart before the horse. Until the STB relinquishes jurisdiction over a rail line, state law is irrelevant. The Federal Circuit clarified in *Caquelin* that "a NITU does *not* effect a taking if, even in the absence of a NITU, the railroad would not have abandoned its line (a necessary prerequisite for termination of the easement under state law) during the period of the NITU" (emphasis added). 959 F.3d at 1363. This is because, where an abandonment is conditional, the STB retains jurisdiction over a line until it has been abandoned pursuant to the conditions imposed by the agency. *Baros*, 400 F.3d 228, 234–35 (2005). Here, the abandonment authority granted by the STB was conditioned upon MCRR's negotiation of the acquisition of the line for public use. Because the Rock Island Line was subject to the STB's jurisdiction and licensing requirements, the only legally recognizable way for MCRR to consummate abandonment of the Rock Island Line would have been to file a notice of consummation. *See Baros* at 234–35; *see also Honey Creek R.R., Inc. – Petition for Decl. Order* at 5.

---

[3] The third prong of the *Presault II* test asks: even if the grant of the railroad's easement was broad enough to encompass a recreational trail, had this easement terminated prior to the alleged taking so that the property owner at the time held a fee simple interest unencumbered by the easement?

[4] MCRR filed the Verified Notice of Exemption on November 18, 2014. The STB issued the NITU on February 25, 2015. Although the original NITU would have expired 180 days thereafter, the MCRR requested and received multiple extensions of the NITU. The last known expiration date of the NITU was February 21, 2019.

MCRR never filed a notice of consummation, which would have ended STB's regulatory jurisdiction and completed a full abandonment of the line. Only then would consideration of state law abandonment factors, such as evidence of an intent to abandon be necessary or possible. Because MCRR did not file a notice of consummation, STB retained regulatory jurisdiction over the railroad corridor and the underlying property.

Plaintiffs cite also to *Caquelin v. United States*, a rails-to-trails case in which the Federal Circuit recently upheld another judgment that a taking occurred under the state law of Iowa when the STB issued an NITU. 959 F.3d 1360 (Fed. Cir. 2020). The Court reasoned that the railroad's filing of an application to abandon, coupled with evidence of track removal, was sufficient evidence to conclude that the railroad would have completed abandonment while the NITU was in effect. 959 F.3d at 1373; *see also Glosemeyer v. United States*, 45 Fed. Cl. 771, 777 (2000) ("[T]he railroads' applications to the ICC for authority to abandon are clear evidence of intent to abandon their easements). In *Caquelin*, no trail use agreement was reached during the 180-day negotiation period, and the railroad refused to consent to an extension of its consummation date, "confirming its interest in abandoning sooner rather than later." *Caquelin*, at 1373.

Three important distinctions can be made between *Caquelin* and the case now before the Court. First, the railroad in *Caquelin* filed a notice of consummation, which ended the STB's regulatory jurisdiction and completed the regulatory abandonment process, thereby allowing for the courts' subsequent consideration of Iowa state law as to property interests. Second, the easements at issue were limited to railroad use.[5] *Caquelin v. United States*, 140 Fed. Cl. 564, 568 (2018). Therefore, under Iowa state law, they were capable of being extinguished through lack of railroad use. Here, however, the easements were not limited to railroad use, so plaintiffs' evidence of line removal, overgrowth, and general lack of railroad use do not establish abandonment. Third, the railroad in *Caquelin* refused to consent to an extension of its consummation date, which the Court considered to be evidence of the railroad's interest in immediate abandonment. Here, conversely, MCRR requested multiple extensions, which would indicate that MCRR intended to delay its abandonment of the Rock Island Rail Line, if the Court were considering abandonment under state law factors.

The Court notes further that the regulatory abandonment process is a permissive one. When a railroad submits an exemption request under the Trails Act, the STB's acceptance of the request merely grants the railroad the *authority* to pursue abandonment. If, after one year from the date of service of a decision permitting abandonment, consummation has not been effected by the railroad's filing of a notice of consummation, and there are no legal or regulatory barriers to consummation, the authority to abandon will automatically expire. In that event, a new proceeding would have to be instituted if the railroad wanted to abandon the line. MCRR declined to file a notice of consummation in accordance with 49 CFR § 1152.29(e)(2). Thus, MCRR did not complete the regulatory abandonment process.

---

[5] "The successor railroad held easements limited to railroad purposes that were exceeded by issuance of the NITU, rendering the government liable for taking plaintiffs' property without just compensation under the Fifth Amendment." *Caquelin v. United States*, 140 Fed. Cl. 564, 568 (2018).

Because abandonment must be consummated according to federal law and regulations and MCRR declined to file a notice of consummation, plaintiffs' argument that MCRR abandoned the rail line, even under state law factors, fails as a matter of law.

### III. CONCLUSION

For the above stated reasons, the following is hereby ordered:

1. Plaintiffs' motion for partial summary judgment is **DENIED**.

2. Defendant's motion for partial summary judgment and cross-motion are **GRANTED**.

The Clerk is directed to enter judgment accordingly. No costs.

It is so **ORDERED**.

s/ Bohdan A. Futey
**Bohdan A. Futey**
**Senior Judge**